***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hall. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission hereby affirms the Opinion and Award with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Commission and subject to the terms of the Workers' Compensation Act and the Commission has jurisdiction over the parties and subject matter.
2. At all times relevant to this claim, including the day of the alleged accident, January 13, 2000, an employer-employee relationship existed between Plaintiff and Defendants.
3. During all relevant periods, Defendant has been insured by Royal Sunalliance Insurance Company.
4. Plaintiff's average weekly wage will be determined at hearing.
5. The issues for determination are as follows:
 Whether Plaintiff sustained an occupational injury or injury by accident arising out of and in the course of employment with the Defendants on January 13, 2000.
 If yes, what benefits is Plaintiff entitled to receive pursuant to the provisions of the North Carolina Workers' Compensation Act?
 ***********
Based upon all the competent evidence of record, the Full Commission finds as fact and concludes as a matter of law the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 48 years old and a registered nurse. Plaintiff had been employed for eleven years as perinatal education coordinator for the Defendants in a program that she was instrumental in developing. Plaintiff was in charge of implementing various educational programs for patients of the hospital and members of the general public.
2. Plaintiff holds a Bachelor of Science in Nursing from Atlantic Christian College (now Barton College) in Wilson, North Carolina, which she attended on scholarship from Nash General Hospital. Plaintiff is also certified in childbirth education with a specialty in teen pregnancy.
3. Mary Strickland, manager of the Women's Center at Nash Health Care Systems, provided Plaintiff with assistance from one of her own unit secretaries if available. Although they would help Plaintiff, they were not specifically assigned to her and were not available all the time.
4. On the evening of January 13, 2000, Plaintiff was working late to manually prepare handbooks for a class, which was to begin that night. This was an activity that the Plaintiff performed when she was unable to find someone to assist her. This particular evening, no clerical assistance was available to Plaintiff, so she was obligated to manually prepare the handbooks herself.
5. The handbooks in question consisted of 12 relatively large handbooks of about 50 pages each.
6. On January 13, 2000, Plaintiff copied the handbook materials, and then began to punch holes and bind them. The type binder used required small, square holes to be punched out along the entire length of the pages that were to be bound together.
7. The hole-punching machine is large and required Plaintiff to stand and manually apply sufficient force to punch the holes.
8. Plaintiff was hurrying, trying to get the books prepared for the class that was to be held that same evening. Plaintiff was acting alone and did not have assistance from any other clerical staff and time was limited, so Plaintiff separated the pages of the handbooks into larger stacks than usual for hole punching in an effort to finish the job more quickly. Plaintiff testified:
 "I was in a hurry and I do remember attempting to do more than that, maybe about half the book, at least once. I can remember that. I couldn't do it."
Plaintiff applied more force than usual to the hole-punching machine in an attempt to perforate the unusually large stacks of paper and to perform the task quicker. This effort was not successful and Plaintiff had to reorganize the papers into smaller stacks to complete the whole punching. Plaintiff was behind due to lack of an assistant and was losing more time because her effort to punch more pages at one time was not successful.
9. During the course of straining to punch holes and bind the handbooks, Plaintiff became dizzy. She felt very off balance, as if she was walking on the deck of a boat or falling to the left. Plaintiff was not having any symptoms or problems with her equilibrium prior to binding the books that evening.
10. Plaintiff managed to finish binding the books, after which she delivered them to the classroom and drove herself home.
11. Plaintiff's medical history is significant for four, recurrent, perilymphatic fistulas, dating to the early 1980s.
12. A perilymphatic fistula is a tract or opening, which allows passage of perilymph, or inner ear fluid, from the inner ear to the middle ear. The causes of perilymphatic fistulas are varied, but can include trauma, exertion, and congenital malformations.
13. Each of the Plaintiff's four, prior fistulas required surgical treatment and resulted in missed time from work. None was pursued as a workers' compensation claim and Defendants accommodated Plaintiff's disability related to each of the three fistulas developed by Plaintiff while in its employ prior to the incident that is the subject of this claim.
14. Following surgical treatment to repair the fourth fistula, which was sustained in 1998, Plaintiff's treating physician imposed permanent restrictions against bending her head below heart-level, lying flat in bed, lifting in excess of 25 pounds, bending, stooping, squatting, straining, and lifting. Plaintiff made Defendants aware of her permanent physical limitations, and Defendants took steps to accommodate them, including allowing her to delegate restricted tasks to an assistant if one was available.
15. Plaintiff did occasionally experience dizziness as a residual effect of her prior fistulas, but was able to perform her regular job duties.
16. Two weeks prior to January 13, 2000, Plaintiff had undergone a routine follow-up examination of her perilymphatic fistula problem by Dr. James S. May, at which time no ongoing related symptoms were detected.
17. During the days following the January 13, 2000 incident at work, Plaintiff's symptoms grew worse. She attempted to continue working, but was unable to do so on a consistent basis.
18. On February 3, 2000, Dr. May diagnosed the Plaintiff with a new perilymphatic fistula that was the result of excessive straining while engaged in book binding activities at work on January 13, 2000,
19. In March 2000, Dr. May performed a surgical repair of the Plaintiff's recurrent perilymphatic fistula. Initially, her symptoms of dizziness and disequilibrium improved, but beginning approximately two weeks after the surgery, Plaintiff began to feel progressively worse. She has, without success, participated in vestibular rehabilitation, in an effort to retrain her central nervous system to accommodate irregularities in her vestibular mechanism.
20. Plaintiff's ongoing symptoms of severe, disabling, disequilibrium are causally related to the perilymphatic fistula sustained at work on January 13, 2000.
21. In July 2001, Plaintiff also underwent a surgical procedure to repair an unrelated, pre-existing, asymptomatic malformation of the cerebella. This procedure was performed by Dr. Stephen Tatter and was undertaken on the small chance that it would correct the ongoing problems believed to be related to Plaintiff's perilymphatic fistula. The surgery was unsuccessful and reaffirmed the opinions of Dr. May and Dr. Tatter that Plaintiff's Chiari malformation was asymptomatic and that her complaints were fistula-related. The Chiari malformation was not related to incident at work.
22. Dr. May testified that Plaintiff has obtained maximum medical improvement of the perilymphatic fistula sustained on January 13, 2000.
23. Dr. May, although not a vocational expert, was unable to identify any employment Plaintiff is capable of performing in light of her permanent physical limitations related to the January 13, 2000 perilymphatic fistula. Such physical limitations include bending her head below heart-level, lying flat in bed, lifting in excess of 25 pounds, bending, stooping, squatting, straining, lifting, climbing, working with machinery, and traveling in a car for any length of time. He went on to say that Plaintiff had worked very hard with her physical therapist to overcome her disabling condition, even to the point of making herself sick. Dr. May testified that Plaintiff is not malingering and is very credible.
24. Plaintiff remains under Dr. May's care and is totally disabled from working at this time as a result of the perilymphatic fistula sustained on January 13, 2000.
25. Plaintiff's average weekly wage on the date of the incident that is the subject of this claim was $940.27, which yields the maximum compensation rate for the year 2000 of $588.00.
26. Plaintiff's hearing testimony is accepted as credible.
 ***********
Based upon the foregoing stipulations and findings of fact, the undersigned makes the following:
 CONCLUSIONS OF LAW
1. On January 13, 2000, Plaintiff applied the use of excessive force in the act of book binding and, as a result, sustained an injury by accident arising out of and in the course of her employment with the Defendants. N.C. Gen. Stat. § 97-2(6); Porter v. Shelby Knit, Inc.,46 N.C. App. 22, 264 S.E.2d 360 (1980). It is well settled in this state that an extra or unusual degree of exertion by an employee while performing a job may constitute the unforeseen or unusual event or condition necessary to make any resulting injury an injury "by accident." See, e.g., Jackson v. North Carolina State Highway Commission,272 N.C. 697, 158 S.E.2d 865 (1968); Gabriel v. Town of Newton,227 N.C. 314, 42 S.E.2d 96 (1947); Gladson v. Piedmont Stores,57 N.C. App. 579, 292 S.E.2d 18, disc. rev. denied, 306 N.C. 556,294 S.E.2d 370 (1982); Bingham v. Smith's Transfer Corp., 55 N.C. App. 538,286 S.E.2d 570 (1982); Porter v. Shelby Knit, Inc., 46 N.C. App. 22,264 S.E.2d 360 (1980). In our opinion, the facts of this case are analogous to those in Porter, in which the Court upheld the Commission's determination that the plaintiff had suffered an injury by accident when he experienced pain while straining to withdraw a rod from a roll of cloth which was "extra tight" and "unusually hard" to pull out. SeeJackson v. Fayetteville Area System of Transportation, 88 N.C. App. 123,362 S.E.2d 569 (1987). Plaintiff, in this case, experienced unusual circumstances, which required her to exert unusual force and attempting to bind the books, due to the lack of assistance and the short time before the books were to be distributed. Although plaintiff was predisposed to sustain a perilymphatic fistula while engaged in labor, she is still permitted to recover compensation because the physical aspects of her employment intensified her pre-existing propensity to the point that she sustained the injury. Starr v. Charlotte Paper Co.,8 N.C. App. 604, 610, 175 S.E.2d 342, 346 (1970); Vandiford v. StewartEquipment Co., 98 N.C. App. 458; 391 S.E.2d 193 (1990).
2. Plaintiff has been totally disabled from working as a result of the January 13, 2000 injury by accident since February 3, 2000 and is entitled to temporary total disability for the period of February 3, 2000 to the present and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
3. Plaintiff has reached the end of the healing period related to the January 13, 2000 injury by accident. N.C. Gen. Stat. §97-29.
4. Plaintiff is entitled to have Defendants pay for all medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability, excluding the treatment and surgery by Dr. Tatter, which was not causally related to Plaintiff's compensable injury. N.C. Gen. Stat. § 97-25.
5. Plaintiff's average weekly wage on the date of injury was $940.27, which entitles her to the maximum compensation rate for the year 2000. N.C. Gen. Stat. § 97-2(5).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay the Plaintiff temporary total disability compensation at the weekly rate of $588.00 from February 3, 2000 and continuing until such time as she returns to work or until further Order of the Commission, subject to an attorney's fee set out below.
2. Defendants shall pay for all medical expenses incurred or to be incurred as a result of Plaintiff's compensable injury as may be required to provide relief, effect a cure or lessen the period of disability, excluding the treatment and surgery by Dr. Tatter, which was not causally related to Plaintiff's compensable injury.
3. A reasonable attorney's fee of 25% of the compensation awarded to Plaintiff in paragraph 1 above is hereby approved to be deducted from the lump sum due Plaintiff and shall be paid directly to Plaintiff's counsel. Thereafter, every fourth check shall be paid directly to Plaintiff's counsel.
4. Defendants shall pay the costs, including an expert witness fee in the amount of $175.00 to Dr. Stephen Tatter.
 S/_____________ Pamela T. Young Commissioner concurring:
 S/_____________ Thomas J. Bolch Commissioner
 S/___________________ Bernadine S. Ballance Commissioner