***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing party has shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission reverses the Opinion and Award of Deputy Commissioner Chapman and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The plaintiff was employed by defendant-employer from February 3, 1958 to October 31, 1987. *Page 2 
2. The defendant-employer was insured by Kemper Insurance Company from 1972 until plaintiff's last day of employment.
3 The parties are subject to the North Carolina Workers' Compensation Act, the defendant-employer employing the requisite number of employees to be bound under the provisions of said Act.
4. Plaintiff's last year of employment was 1987, and the parties stipulated that the appropriate compensation rate is the maximum rate for 1987 which is $308.00 per week.
5. Plaintiff was exposed to asbestos for at least 30 days in seven consecutive months pursuant to N.C. Gen. Stat. § 97-57 and the last injurious exposure occurred during his employment with defendant. Plaintiff is suffering from asbestosis and pleural disease as a result of said exposure. The parties have a dispute as to whether the plaintiff is suffering total and permanent disability as a result of his occupational disease process.
In addition, the parties stipulated into evidence a packet of discovery responses.
The Pre-Trial Agreement dated December 1, 2004, which was submitted by the parties, is incorporated by reference.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was born in 1936, began working for defendant-employer on February 3, 1958 as a melt operator in the Finishing Department where silicon was melted. The silicon process was discontinued several years later, and the Brevard plant began to produce film. Consequently, in 1963 plaintiff started training to work on line #2 as the #2 continuous polymer *Page 3 
department was being constructed. Equipment in the department was insulated with asbestos-containing insulation while plaintiff was training in the vicinity. He worked on the line once construction was complete.
2. In 1967 and 1968 a third continuous polymer department was constructed next to line #2 in such a manner that line #2 was open to the construction process, which involved equipment being insulated with asbestos-containing insulation. There was also a significant exposure to asbestos in 1969 when the plant went through a major shutdown during which the machines were torn down for repairs and were then re-insulated. Aside from the major exposures, plaintiff had to work around and occasionally move asbestos-containing insulation on machinery while performing his daily tasks.
3. In 1980, plaintiff was promoted to shift supervisor. Late that year, the company began having the employees examined and x-rayed as part of a program to monitor them for possible development of asbestosis. An abatement program began in 1984. Areas of the plant would be roped off and the asbestos-containing insulation would be removed.
4. Plaintiff began smoking cigarettes when he was 15 or 16 years old, and he smoked approximately two packs per day until 1987. In January 1987 he had a heart attack and had to undergo quintuple cardiac bypass surgery. He returned to work in May 1987, working half days, but he subsequently retired in October 1987 at the advice of his physician. Before he retired, he had experienced shortness of breath which inhibited his ability to walk through the plant and to climb the steps between the six floors. He also felt short of breath while doing paperwork and talking on the telephone. His shortness of breath was attributed to his heart condition.
5. Even though plaintiff retired, he apparently continued to be monitored *Page 4 
periodically as part of defendant-employer's asbestos surveillance program.
6. Plaintiff developed angina in the mid-1990's and in 1996 underwent a sextuple coronary bypass operation. Due to complications from the surgery, he apparently developed pancreatitis and underwent surgery for that condition. However, his medical records were not submitted, so the specifics of the diagnosis and treatment were not disclosed by the evidence. Plaintiff also reported having had pneumonia after two knee operations.
7. On November 8, 2001 plaintiff was sent by defendant-employer to Dr. Prechter, a pulmonologist, after an abnormal x-ray. Dr. Prechter took a history from plaintiff of shortness of breath with exertion, a diagnosis of congestive heart failure and past exposure to asbestos. There were no major findings on examination, just a little edema in the legs. The doctor ordered pulmonary function studies and requested plaintiff's old x-rays. Plaintiff returned to him on December 7 after having undergone the testing which revealed mild airflow obstruction, normal lung volume, mildly elevated residual volume and mildly reduced diffusion capacity. These findings were more consistent with chronic obstructive pulmonary disease, which would be associated with his smoking history. Review of his past x-rays demonstrated increasing thickening of the pleura over the years, which would be associated with his asbestos exposure at work.
8. Dr. Prechter concluded that plaintiff's shortness of breath was primarily the result of his heart problem and mild chronic obstructive pulmonary disease but recommended a high resolution CT scan to further delineate his asbestos-related problems. Plaintiff subsequently underwent the CT scan, which showed thickening and calcification on lower pleural surfaces and minimal parenchymal interstitial changes at both lung bases. The findings, along with the pulmonary test results, caused Dr. Prechter to limit the diagnosis to pleural plaques consistent *Page 5 
with asbestos exposure. In his opinion, plaintiff had not yet reached the point where he would be diagnosed with asbestosis. However, the asbestos-related findings were sufficiently pronounced to cause some shortness of breath.
9. Plaintiff's attorney sent him to Dr. Schwartz, a pulmonologist at Duke, on August 23, 2002. His examination was relatively normal but pulmonary function testing demonstrated restrictive lung function as well as evidence of airflow obstruction. Dr. Schwartz interpreted his chest x-ray and CT scan as showing evidence of bilateral interstitial lung disease in additional to the pleural plaquing. In the doctor's opinion, plaintiff had asbestosis and asbestos-induced pleural fibrosis with restrictive lung function and abnormal gas exchange. This was the only time he saw plaintiff.
10. In late 2002 plaintiff's family doctor sent him to Dr. Domby, another pulmonologist, for evaluation. Plaintiff had already undergone pulmonary function studies in a mobile unit in Jacksonville, which indicated reduced lung capacity and forced vital capacity. Dr. Domby found nothing significant on examining plaintiff. He continued to see plaintiff periodically after that examination. However, the nature of any treatment he provided was not disclosed by the evidence.
11. Plaintiff had more chest x-rays taken in 2003 and underwent another CT scan. Dr. Domby reviewed the films and found calcification of the lower pleural surfaces in the middle aspect of both lungs, but there did not appear to be much interstitial disease. At that point, he was of the impression that plaintiff had asbestos-related pleural disease with calcification, but it did not appear that plaintiff had significant asbestosis.
12. Dr. Domby next saw plaintiff In August 2004. On that examination, there were some rare crackles, which was a new finding. Although his chest x-ray was noted to not show *Page 6 
significant interstitial changes and to be similar to the previous year's x-ray, his pulmonary function tests were materially worse. However, plaintiff coughed during the forced expiratory effort, which affected the test results. At this time, Dr. Domby diagnosed him with asbestosis which was causing restrictive defects in his lung function. In his deposition, however, Dr. Domby indicated that he was less confident in the diagnosis based upon his review of the last CT scan, which did not reveal much evidence of interstitial disease.
13. Dr. Prechter saw plaintiff once more on December 18, 2005 at defendants' request. The doctor did not perform additional tests but reviewed the reports of Dr. Schwartz and Dr. Domby. According to the reports, plaintiff's lung capacity had dropped from 88% to 56%, and there had been significant reductions in residual volume and vital capacity. The reported findings would indicate moderate restrictive lung disease, yet there was a letter from Dr. Domby which stated that the CT scan performed in 2003 did not demonstrate significant interstitial disease, which was consistent with Dr. Prechter's earlier findings. In addition, a later report from Dr. Domby stated that there had been no significant change in the x-ray findings from July 2003 to July 2004. In view of the inconsistencies and the fact that plaintiff coughed during his last pulmonary function study, Dr. Prechter recommended that plaintiff undergo repeat pulmonary function testing. There was no evidence that the repeat testing was ever performed.
14. Plaintiff has continued to experience shortness of breath with exertion, which has worsened, since he retired in October 1987. He was found to be disabled due to his heart condition by the Social Security Administration in 1991 and has made no known effort to return to work since then. Dr. Domby, who was his treating pulmonologist, has not evaluated plaintiff with respect to disability presumably because plaintiff was past retirement age and had not worked in over 15 years. The doctor was comfortable in stating that plaintiff would not be able *Page 7 
to perform a job which required walking or much exercise, but his testimony was not sufficient to establish total disability, especially since plaintiff's educational background was not disclosed by the evidence. Considering the nature of Dr. Schwartz' involvement, his limited time with plaintiff and the inconsistencies in the pulmonary function studies, the testimony of Dr. Schwartz was not persuasive regarding disability.
15. Plaintiff was not diagnosed with asbestosis until August 2002 when Dr. Schwartz saw him at the request of his attorney. His pulmonary function tests for that evaluation and subsequent ones were significantly worse than those performed in 2001. The x-rays and CT scans performed over the period in question did not reflect such a significant increase in findings. The accuracy of pulmonary function tests depends, in part, on the effort exerted by the person being tested. The only explanation for the dramatic worsening of those findings was offered by Dr. Prechter who noted that plaintiff coughed during forced expiration on one of the tests. However, there was no explanation for the significant worsening on the other pulmonary function tests performed in the three years after Dr. Prechter's evaluation in 2001. Asbestos-related changes normally progress slowly.
16. As of August 2004, plaintiff had developed asbestosis and asbestos-related pleural plaques which the parties have stipulated were compensable work-related conditions. These conditions caused him to have more shortness of breath than his heart condition and chronic obstructive pulmonary disease were otherwise causing. However, his asbestosis was mild. Plaintiff had retired from his employment with defendant-employer on disability due to unrelated heart problems in 1987 and had never attempted to return to work in any other capacity. He had not been part of the work force for almost 17 years by the time Dr. Domby diagnosed him with asbestosis. The medical records for his obviously serious heart condition were not placed into *Page 8 
evidence. His educational background was also not disclosed by the evidence. With the evidence presented, he did not prove that he was rendered permanently and totally disabled as a result of his asbestosis and pleural plaques.
17. As a result of his asbestosis and pleural plaques, plaintiff has sustained permanent damage to his lungs, which are important internal organs. A fair and equitable amount of compensation for such organ damage is $20,000.00 for each lung.
18. Plaintiff attempted to distinguish the pleura from the lungs in order to receive additional compensation for organ damage. The pleura lines the outside of the lungs and the inside of the chest wall to allow a slippery surface so that the chest can expand as the lungs inflate. Since the location and function of the pleura is so tied to that of the lungs, the pleura is not a separate and distinct organ or part of the body any more than a tendon sheath is distinct from the tendon it covers. Consequently, plaintiff is not entitled to compensation for damage to the pleura.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Since plaintiff retired years before he was diagnosed with asbestosis and was therefore not "removed" from the workforce, he is not entitled to 104 weeks of compensation under N.C. Gen. Stat. § 97-61.5.Austin v. Continental General Tire, 354 N.C. 344 (2001).
2. Having not proven temporary total disability resulting from his compensable asbestosis and pleural plaques, plaintiff is not entitled to compensation for such. N.C. Gen. Stat. § 97-29; Russell v. Lowe'sProduct Distribution, 108 N.C. App. 762 (1993); Hilliard v. Apex CabinetCompany, *Page 9 305 N.C. 593, 290 S.E.2d 682 (1982).
3. Plaintiff is entitled to compensation in the amount of $20,000.00 for each lung for the permanent organ damage he sustained as a result of his compensable asbestosis and pleural plaques. N.C. Gen. Stat. §97-31(24).
4. Plaintiff is entitled to have defendants provide all medical compensation arising from this occupational disease. N.C. Gen. Stat. §§ 97-2(19); 97-59.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff for organ damage in the total amount of $40,000.00, subject to the attorney's fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of his occupational disease.
3. A reasonable attorney's fee in the amount of $10,000.00 is hereby approved for plaintiff's counsel, which fee shall be deducted from the aforesaid Award and paid directly to Mr. Pauley.
4. Defendants shall pay the costs.
This the 4th day of April, 2006.
S/___________________ BUCK LATTIMORE CHAIRMAN *Page 10 
CONCURRING:
 S/____________________ PAMELA T. YOUNG COMMISSIONER
DISSENTING WITHOUT WRITTEN OPINION:
 S/__________________ THOMAS J. BOLCH COMMISSIONER *Page 1